**Opinion issued May 29, 2025**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00356-CV

_____

**CITY OF HOUSTON, Appellant**

**V.**

**JARRETT JOHNSON, Appellee**

---

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-20647**

---

## MEMORANDUM OPINION

This suit arises from a motor-vehicle collision involving cars driven by a Houston Police Department (HPD) officer and Jarrett Johnson. As Johnson headed home from work in the early morning hours, he drove his tan sedan south along Highway 59 and exited onto the service road. Johnson had a green light at the intersection with Crosstimbers Street. He heard no sirens and saw no lights.

Johnson drove into the intersection but never made it safely through. The HPD officer was driving his patrol car west on Crosstimbers at exactly the same time. The officer had a red light but ran through it and crashed his patrol car into the left side of Johnson's sedan. Although the collision did not cost either driver his life, it sent Johnson to the hospital for surgery, apparently on his broken femur.

Johnson and the officer differed about the facts of the collision, and neither of them told a completely consistent story. The officer initially stated that he was traveling between 35 and 60 miles per hour without his siren on, but he later changed his story in an affidavit to state that he was going under the speed limit of 35 miles per hour with his siren on. He also stated that he slowed down and looked for oncoming traffic, but he did not see Johnson's sedan until it was directly in front of him moments before the crash. HPD disciplined the officer for his driving during the incident, but the officer stated he did not know why he was disciplined or agree with it.

For his part, Johnson initially stated that he did not hear sirens or see lights until seconds before the crash, but he later modified his statement and said he did not notice them at all until after the crash. Johnson consistently stated, however, that the officer was speeding at about 70 miles per hour when the crash occurred.

Johnson sued the City of Houston alleging that it was vicariously liable for the officer's negligent use or operation of his patrol vehicle under the Texas Tort

Claims Act (TTCA). *See* TEX. CIV. PRAC. & REM. CODE § 101.021(1). The City moved for summary judgment asserting that it was immune from suit under the TTCA, but the trial court denied the motion. In two issues on appeal, the City contends that the trial court erred by denying summary judgment because: (1) the officer was entitled to official immunity, and thus the City was entitled to governmental immunity; and (2) the TTCA's emergency exception applied, and thus the City retained its governmental immunity.

Because the contradictions, inconsistencies, and credibility questions present in the record make this case inappropriate for summary judgment, we affirm.

**Background**

During the night shift on April 6, 2020, HPD officer Michael Doyle Cater Jr. was on patrol duty in his marked patrol car in northeast Houston. Around 4 a.m., he received a priority two call to respond to a reported shooting a few miles from his location. The City's evidence indicates that someone had been shot in the leg. Cater decided to respond as a backup officer.

According to Cater, a priority two call typically does not require an officer to respond with the patrol car's lights and siren activated, but the officer may activate them in certain circumstances. Cater initiated his response without the patrol car's lights and siren. He drove north briefly on Highway 59 before exiting at Crosstimbers Street. Cater claims that he activated the lights and siren on his patrol

3

car as he exited the freeway. As he approached the intersection with Crosstimbers from the Highway 59 service road, he ran a red light and turned left on Crosstimbers. He drove under the overpass and reached the next intersection with the Highway 59 service road running in the opposite direction. At this intersection, Cater had another red light. He decided to run the red light, as Texas law allows emergency vehicles to do "after slowing as necessary for safe operation." *See* TEX. TRANSP. CODE § 546.001(2). But Johnson had entered the intersection from the service road on a green light at the same time, and Cater's patrol car hit Johnson's car, allegedly injuring Johnson.

On appeal, the parties dispute Cater's speed as he drove down Crosstimbers, through the red light, and into the intersection when he hit Johnson's car; whether Cater had activated both the emergency lights and the siren on his patrol car before the crash; whether he slowed down to ensure the intersection was clear before running the red light; and whether he looked in the direction of oncoming traffic before running the red light.

Johnson filed suit against the City alleging that it was vicariously liable for Cater's negligent use or operation of his patrol vehicle under the TTCA. *See* TEX. CIV. PRAC. & REM. CODE § 101.021(1). In his live petition, Johnson alleged that Cater's negligent use or operation of his patrol car caused "a major automobile accident," and Johnson sustained "serious bodily injuries and substantial property

4

damage." He alleged that Cater was negligent for multiple reasons, including by failing to maintain a proper lookout, failing to stop at a red light, failing to enter the intersection safely, failing to use his emergency lights and/or siren, failing to sound his horn, and speeding. Johnson also alleged that Cater acted recklessly.

Johnson further alleged that the City's governmental immunity was waived because Cater did not comply with the laws and ordinances applicable to emergency action. He alleged that Cater violated several provisions of the Transportation Code applicable to emergency action, including section 546.001(2) because Cater ran the red light without slowing as necessary for safe operation. Johnson sought damages for his alleged bodily injuries and property damage to his car, which was allegedly totaled in the crash.

The City filed a motion for traditional summary judgment alleging that it was immune from suit, and therefore the trial court lacked subject-matter jurisdiction over Johnson's suit. The City asserted two grounds for immunity. First, the City argued that Cater was entitled to official immunity because he had discretion to act, he acted in good faith, and he acted within the scope of his authority. Concerning the good faith element, the City argued that the need to respond to the reported shooting outweighed the risks to public safety. According to the City, Cater "wanted to arrive quickly" at the location of the reported shooting "to provide aid to the victim and to capture the suspect." The City argued that this need outweighed the risks to

5

public safety because Cater considered alternative routes and the speed he should drive. He also considered that his "vehicle was in good working condition, and he considered the fact that the weather was clear, the roads were dry, [and] it was early morning time, with little to no traffic."

Second, the City argued that the TTCA's emergency exception applied because Cater was responding to an emergency call, he complied with the laws and ordinances applicable to emergency action, he did not act with conscious indifference or reckless disregard for the safety of others, and Johnson could not establish that Cater's emergency response caused Johnson harm. Regarding Cater's compliance with laws applicable to emergency action, the City argued that several sections of the Transportation Code applied to Cater's emergency response but that "Cater's conduct falls into one subsection of [Transportation Code] § 546.001, and that is he exceeded the maximum speed limit but did not endanger life or property."

The City attached several documents as summary judgment proof. A document entitled "CAD Event History" for the shooting call to which Cater was responding stated that someone had been "shot in [the] leg."

In a Texas Peace Officer's Crash Report, HPD Sergeant Jason Hill reported that the crash occurred at 4:09 a.m., and Hill responded to the crash location about 15 minutes later. He reported that the speed limit was 35 miles per hour on Crosstimbers. Cater reportedly told Hill that he went through the intersection and

6

struck Johnson's vehicle. Johnson told Hill that he had exited Highway 59 at Crosstimbers and had a green light at the intersection. As he drove through it, his car was hit by Cater's patrol car, and he "didn't hear sirens or see any lights" on the patrol car. The crash report concluded that Cater "failed to exercise duty and care."

The City also attached a written statement that Johnson submitted to HPD. Johnson stated that as he drove down the service road, his light was green and Cater "T-bone[d]" the back of his car. He did not see lights or hear sirens on Cater's patrol car until seconds before the impact. He believed that Cater was driving "about 70 mph" when he hit Johnson's car.

In a HPD crash questionnaire that Cater submitted two days after the accident, Cater estimated he was driving "35–60" miles per hour at the time of the crash, and he "was driving fast and in a hurry." He stated twice that he was "unsure" whether he was using his siren, but he claimed that his overheard lights were on. After turning left on Crosstimbers from the northbound Highway 59 service road, he "slowed down and looked both ways" because he had a red light at the next intersection with the southbound service road. "Believing the intersection was clear [he] continued straight [through the service road intersection] while picking up speed." He first saw Johnson's car when it was "in front of [him]" at the intersection. He turned the steering wheel in an attempt to avoid a collision, but he hit Johnson's car.

7

The City also attached affidavits signed by Cater and his supervisor, HPD Patrol Sergeant Christopher Kelly.

Cater averred that he was on patrol during the night shift when he received a priority two call for a shooting. A priority two call "means the usual response is without lights and siren, but if the circumstances dictate otherwise, [the response] may be run with lights and siren due to the urgency of the call, the facts that are being reported from the scene, and the need to arrive quickly." Cater stated that dispatch informed him that someone had been shot and that a suspect was still in the area, so he decided to respond to the call as backup. He wanted to arrive quickly to help apprehend the suspected shooter and provide any necessary aid to the victim. Cater stated that he considered alternative routes but took the "route that would give [him] the safest approach."

Cater initially drove on Highway 59 and exited at Crosstimbers. Cater claimed that he turned on his emergency lights and siren as he exited the freeway. Although he had previously stated that he was unsure whether his siren was activated, he now believed that his siren was on based on his review of a video recording from his body camera. He stated that he turned the camera on immediately after the crash, the audio began recording at that time, he could hear his siren when the audio began recording, and he did not remember turning the siren on after the crash.

He also stated in his affidavit that he was "going under 35 miles per hour" when the crash occurred. He acknowledged his prior statement in the questionnaire that he was going between 35 and 60 miles per hour, but he now believed that he was driving under 35 miles per hour "upon reflection, and upon reviewing [his] body worn camera."

Cater conceded that he had a red light at the intersection where the crash occurred. He claimed that he slowed down, looked in the direction of oncoming traffic "but did not see a vehicle, so [he] entered the intersection and began to increase [his] speed slightly." He first saw Johnson's car when it was "in front of [him]" as he drove into the intersection. He turned the steering wheel and braked to try to avoid a collision, but his vehicle hit Johnson's vehicle.

Cater concluded that his actions were reasonable under the circumstances. Although he believed that his siren was on at the time of the crash, he also believed that it would have been reasonable to respond without a siren to deprive the suspected shooter of advance notice of his arrival, giving Cater a better opportunity to apprehend the suspect without the suspect fleeing or attacking officers. He also believed that even if he was driving 70 miles per hour on Crosstimbers, it would have been reasonable and necessary.

Sergeant Kelly's affidavit was largely duplicative of Cater's affidavit. Kelly based his opinions on his conversations with Cater and his review of the video

9

recording from Cater's body camera, Cater's affidavit, the HPD crash questionnaire, and the crash report. Kelly agreed that Cater acted reasonably under the circumstances.

Finally, the City attached a three-minute video recording from Cater's body camera. Cater stated in his affidavit that he activated the camera "within moments after the crash occurred." The recording captured a few minutes of video before he activated the camera as well as the crash, but the audio began recording only from the moment the camera was activated. We discuss the video in further detail below.

Johnson filed an amended summary judgment response disputing that the City was immune from suit on either ground raised in the City's motion. First, Johnson argued that the City did not conclusively establish that Cater was entitled to official immunity by acting in good faith because the City's arguments assumed the truth of disputed facts. Johnson argued that fact issues existed concerning whether Cater operated his patrol car safely as he drove through the red light and into the intersection where the crash occurred. Johnson also argued that fact issues existed regarding whether Cater slowed down before running the red light, whether he used his siren as necessary, whether he ensured the intersection was clear before driving through it, and whether he violated various provisions of the Transportation Code. Johnson pointed out that the crash report had concluded that Cater failed to exercise duty or care.

10

Second, Johnson argued that fact issues existed concerning the applicability of the TTCA's emergency exception. Johnson did not dispute that Cater was responding to an emergency call. But Johnson argued that fact issues existed concerning whether Cater violated multiple provisions of the Transportation Code applicable to emergency action and whether Cater acted recklessly. Concerning violations of laws applicable to emergency action, Johnson acknowledged that police officers responding to an emergency may run a red light after slowing as necessary for safe operation under Transportation Code section 546.001(2), but he argued that fact issues existed concerning Cater's compliance with this law.

Johnson attached numerous documents to support his amended summary judgment response. These documents included the crash report, the HPD crash questionnaire, and the 3-minute video recording from Cater's body camera. Johnson also attached a longer, nearly 43-minute video recording from Cater's body camera. This recording captured nearly forty minutes after the car crash during which time Cater waited at the scene of the crash. In this recording, Cater told another officer that he did not have his siren on at the time of the crash.

Johnson also relied on several additional documents. In an affidavit, Johnson stated that he was driving on the Highway 59 service road, he had a green light at the intersection with Crosstimbers, and he drove into the intersection where Cater hit his vehicle. He stated that Cater was "traveling approximately 70 miles per hour

11

as he entered into the intersection, and [he] did not appear to slow down before impact." Johnson also stated that he "did not hear a siren before the impact." He acknowledged that this statement differed from his earlier statement that he did not hear a siren (or see lights) until seconds before the impact, but he stated that his prior statement was incorrect due to surgery he had on the day of the accident, and the investigating officer asked him to make a statement while he was in the hospital.

Johnson also attached deposition testimony from HPD Sergeant Hill, who investigated the crash and completed the crash report. Hill testified that Cater violated Transportation Code section 546.001(2) because "it didn't appear that he slowed down before proceeding—before approaching that intersection" or that he ran the red light safely. Hill reached this conclusion after viewing the video recording from Cater's body camera. He acknowledged that a police officer responding to an emergency may run a red light, but the officer must slow down to ensure that the intersection is clear and that it is safe to proceed. Hill further testified that in the longer version of the video recording from Cater's body camera, Cater told another officer that he did not have his siren on before the crash. Hill agreed that Cater did not run the red light safely and that if he had done so while driving 70 miles per hour—which was twice the speed limit—it would be "reckless." Hill explained that his conclusion in the crash report that Cater "failed to exercise duty

12

and care" was based on his determination that Cater did not slow down at the red light.

At Cater's deposition, Cater acknowledged that HPD had suspended him for two days based on his failure to exercise duty and care, although he denied knowing the specific reason for the discipline, and he disagreed with it. Cater repeatedly testified that he slowed down before running the red light, but when shown the video recording from his body camera, he could not point to any specific part of the video showing that he slowed down. Instead, he testified that he "continuous[ly]" slowed down beginning from the time he turned left on Crosstimbers until he reached the red light at the next intersection where the crash occurred. He also testified that he had his siren activated, although he acknowledged that in the longer video recording, he told another officer that he did not have it activated. Finally, Cater testified that an officer has discretion to use emergency lights and sirens after notifying dispatch, but no evidence showed that he had notified dispatch that he would use his lights or his siren.

Johnson's amended response also relied on a declaration and deposition testimony from his expert witness, former police chief Daniel Busken. Busken agreed with Sergeant Hill that Cater did not slow as necessary for safe operation before running the red light, and he likewise concluded that Cater violated Transportation Code section 546.001(2). He provided several reasons why Cater

13

violated this section, and he analogized "not slowing down, not taking control of an intersection when you are going against a red light" to "basically playing Russian Roulette behind the wheel of a vehicle." He testified that "Cater could have slowed down before entering the intersection and turned on both his lights and sirens to alert other motorists of his presence. This slight delay would certainly not outweigh the potential risk of causing significant bodily injuries to other motorists." Busken further testified that even if Cater had slowed his speed to 35 miles per hour, he still would have been driving too fast to ensure no traffic was approaching the intersection before running the red light. Busken testified that Cater's failure to exercise duty and care, as stated in the crash report, was the only factor contributing to the accident.

Finally, Johnson objected to Sergeant Kelly's affidavit because it failed to consider disputed facts or address them together.

The City did not file a summary judgment reply. The trial court signed an order denying the City's motion for summary judgment. The court also signed an order striking both Cater's affidavit and Kelly's affidavit. This appeal followed.

### Texas Tort Claims Act

In two issues on appeal, the City argues that the trial court erred by denying summary judgment because the City was entitled to governmental immunity on two grounds: (1) Officer Cater's official immunity; and (2) the TTCA's emergency

14

exception. Preliminarily, the City also argues that the trial court abused its discretion by striking the affidavits of Officer Cater and Sergeant Kelly.

## A. Standard of Review

A governmental unit can raise its immunity from suit in various procedural vehicles, including a motion for summary judgment as the City did here.[1] *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019) (quotation omitted). We review a trial court's summary judgment ruling de novo. *Laverie v. Wetherbe*, 517 S.W.3d 748, 752 (Tex. 2017); *City of Houston v. Nicolai*, 695 S.W.3d 489, 494 (Tex. App.—Houston [1st Dist.] 2024, pet. denied) (en banc). To obtain a traditional summary judgment, the moving party must produce evidence establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *see City of Austin v. Powell*, 704 S.W.3d 437, 448 (Tex. 2024) (stating that when governmental defendant files summary judgment motion, defendant carries initial burden to meet summary judgment proof standard for assertion that trial court lacks subject-matter jurisdiction) (quoting *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012)).

---

[1] We have jurisdiction over this appeal from the trial court's interlocutory order denying the City's assertion of immunity from suit in the summary judgment motion. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8); *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 549 (Tex. 2019) (stating that section 51.014(a)(8) authorizes interlocutory appeal when trial court denies summary judgment based on governmental entity's claim that court lacked subject-matter jurisdiction) (quotation omitted).

When a defendant moves for summary judgment on an affirmative defense, it must conclusively establish each element of the defense. *Nicolai*, 695 S.W.3d at 494. Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005); *Nicolai*, 695 S.W.3d at 494. If the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *Nicolai*, 695 S.W.3d at 494.

In reviewing a summary judgment ruling, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Powell*, 704 S.W.3d at 448 (quoting *City of San Antonio v. Maspero*, 640 S.W.3d 523, 528–29 (Tex. 2022)); *City of Houston v. Branch*, 695 S.W.3d 580, 586–87 (Tex. App.—Houston [1st Dist.] 2024, pet. denied) (en banc). We may not, however, disregard necessary contextual evidence or "evidence and inferences unfavorable to the [nonmovants] if reasonable jurors could not." *City of Houston v. Rodriguez*, 704 S.W.3d 462, 470 (Tex. 2024) (quoting *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 771 (Tex. 2018)); *Branch*, 695 S.W.3d at 587 (quoting same).

If the plaintiff raises a fact issue concerning the applicability of an immunity waiver, then the trial court must deny the motion for summary judgment. *Powell*,

16

704 S.W.3d at 448. But the court must grant the motion if no fact issue exists on the jurisdictional issue. *Id.*

Although we review a trial court's summary judgment ruling de novo, we review the trial court's decision to exclude evidence in a summary judgment proceeding for an abuse of discretion. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84–85 (Tex. 2018); *Starwood Mgmt., LLC ex rel. Gonzalez v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017) (per curiam). A trial court abuses its discretion if it acts arbitrarily or without reference to guiding rules and principles. *Swaim*, 530 S.W.3d at 678 (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985)); *Westview Drive Invs., LLC v. Landmark Am. Ins. Co.*, 522 S.W.3d 583, 599–600 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). We "must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *Westview Drive Invs.*, 522 S.W.3d at 600.

Moreover, even if the trial court abused its discretion in ruling on the admissibility of evidence, we will only reverse the trial court's ruling if the error was harmful, that is, if it probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012); *Westview Drive Invs.*, 522 S.W.3d at 600. To determine whether an erroneous ruling probably resulted in an improper judgment, we review the entire record, and

17

the complaining party must demonstrate that the judgment turned on the excluded evidence. *Westview Drive Invs.*, 522 S.W.3d at 600.

## B.     Evidentiary Objections

The City first contends that the trial court erred by striking the affidavits of Officer Cater and Sergeant Kelly.

Rule 166a authorizes a movant to submit affidavits in support of summary judgment. TEX. R. CIV. P. 166a(c). "A summary judgment may be based on uncontroverted testimonial evidence of an interested witness . . . if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." *Id.* Affidavits must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." TEX. R. CIV. P. 166a(f).

First, the City argues that the trial court abused its discretion by striking Cater's affidavit because Johnson did not object to it and both parties cited to it for factual support in their summary judgment briefing. Johnson responds that Cater's affidavit did not comply with Rule 166a(c) and was not competent summary judgment evidence because the affidavit contained inconsistencies by stating that Cater engaged his emergency lights and siren, but even if he did not, another

reasonably prudent officer could have believed that responding to the call without engaging this equipment was reasonable.

The appellate record does not reflect that Johnson objected to Cater's affidavit in his amended summary judgment response.[2] Nevertheless, the court signed an order striking the affidavit. The City argues that the sua sponte ruling is irregular.

The City relies on Rule 166a(f), arguing that the rule "requires objections to formal deficiencies in summary judgment evidence be made in writing," and that formal deficiencies are defined as "proof that is competent, but inadmissible." Rule 166a(f) states that "[d]efects in the form of affidavits or attachments [to a summary judgment motion] will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend." *Id.* Rule 166a(f) is thus a rule of error preservation. *See Redmond v. Clasen*, No. 01-20-00209-CV, 2021 WL 5182879, at *2 (Tex. App.—Houston [1st Dist.] Nov. 9, 2021, no pet.) (mem. op.) (stating that Rule 166a(f) requires party to "object to a defect in the form of an affidavit and secure a ruling from the trial court on the objection to preserve the error on appeal or else the objection is waived").

But the City does not allege any defect "in the form of affidavits" as "grounds for reversal." Quite the opposite, the City denies such a defect. It seeks reversal based

---

[2]    In his original response, Johnson argued that the trial court should not consider Cater's affidavit because he had not been designated as an expert witness. He did not include this objection in his amended response.

19

on its contention that no defects existed in the affidavit. Thus, Rule 166a(f) does not support the City's argument.

We also disagree with the City that Johnson's amended response cited Cater's affidavit for factual support. True, in the introduction section of his response, Johnson cited Cater's affidavit for background contextual evidence, including evidence that Cater was responding to an emergency call, he was performing his duties in the course and scope of his employment, and he ran a red light. *See Rodriguez*, 704 S.W.3d at 470 (stating that courts may not disregard necessary contextual evidence). But Johnson did not rely on the affidavit in arguing that Cater did not act in good faith or that the TTCA emergency exception did not apply, except perhaps to argue that the affidavit contained disputed facts.

Even if we agreed with the City that the trial court abused its discretion by striking an affidavit that drew no objection, we would nevertheless conclude that any error was harmless and thus nonreversible. *See* TEX. R. APP. P. 44.1(a)(1); *see also Waldrip*, 380 S.W.3d at 132 ("Even if the trial court abused its discretion in admitting certain evidence, reversal is only appropriate if the error was harmful, *i.e.*, it probably resulted in an improper judgment."). As we conclude below in our de novo review of the summary judgment evidence, the trial court did not err by denying the City's motion for summary judgment. Our conclusion would remain the same regardless of whether we consider Cater's affidavit because the affidavit does

20

not establish that the City was entitled to summary judgment. *Cf. Westview Drive Invs.*, 522 S.W.3d at 600 (stating that to determine whether evidentiary ruling probably resulted in improper judgment, we review entire record, and complaining party must demonstrate that judgment turned on excluded evidence). The affidavit is the City's primary evidence in its favor, but it does not alter our ultimate conclusion that the City did not establish its entitlement to summary judgment. We therefore conclude that the trial court's striking of Cater's affidavit did not probably result in an improper judgment, and thus any error was harmless and nonreversible. *See* TEX. R. APP. P. 44.1(a)(1).

Second, the City argues that the trial court abused its discretion by striking Sergeant Kelly's affidavit because although Johnson filed written objections to this affidavit, he did not object to specific statements in the affidavit or provide reasons why the affidavit was objectionable. We disagree. Among other things, Johnson objected that:

> Kelly state[d] that even if Officer Cater was driving "70 miles per hour on the service road," he believes it would be reasonable under the circumstances; he state[d] that driving without lights and sirens could have been reasonable under the circumstances; and he state[d] that "proceeding past red signals after slowing as necessary for safe operation and [Cater's] driving in excess of the speed limit did not endanger life or property."

Johnson then provided specific reasons why he contended that the quoted sentences were based on disputed facts. Therefore, we conclude that Johnson objected to

21

specific statements in Kelly's affidavit and provided reasons why the statements were objectionable. Thus, the City has not established that the trial court abused its discretion by striking Kelly's affidavit.

We note that Kelly's affidavit duplicates much of Cater's affidavit. For the most part, Kelly reiterates and agrees with Cater's statements. But Kelly was not present when the crash occurred. He concedes that his statements were based on his "personal conversations with" Cater and his review of "Cater's body-worn camera footage of the crash, his affidavit for this case, his crash questionnaire, and the crash report."

Indeed, although the City spends several pages quoting from Kelly's affidavit in the facts section of its appellate brief—essentially reiterating facts already stated in Cater's affidavit—the City's appellate arguments only rely on Kelly's affidavit three times: once to argue that Kelly believed Cater's speed was reasonable under the circumstances, and twice to argue that Kelly agreed with various statements in Cater's affidavit. Thus, even if we agreed that Kelly's affidavit was improperly stricken, nothing in it would change our analysis or our conclusion that the trial court properly denied summary judgment.

In sum, we conclude that any error in striking Cater's affidavit was harmless, but we will consider the affidavit in reviewing the trial court's summary judgment

22

ruling. We further conclude that the City has not shown any harmful error in striking Kelly's affidavit.

## C.     Official Immunity

In its first issue, the City contends that the trial court erred by denying summary judgment because Officer Cater was entitled to official immunity, and thus the City was entitled to governmental immunity.

### 1.     Governing Law

"As a political subdivision of the state, the City is 'immune from suit unless [its] immunity is waived by state law.'" *Powell*, 704 S.W.3d at 448 (quoting *Maspero*, 640 S.W.3d at 528). Generally, the plaintiff "bears the burden of affirmatively showing waiver of immunity." *Id.* at 447 (quoting *Maspero*, 640 S.W.3d at 528).

The TTCA provides a limited waiver of governmental immunity. *See Rattray v. City of Brownsville*, 662 S.W.3d 860, 871 (Tex. 2023); TEX. CIV. PRAC. & REM. CODE § 101.025(a) ("Sovereign immunity to suit is waived and abolished to the extent of liability created by this chapter."). Relevant here, TTCA section 101.021(1) waives immunity for the negligent use or operation of a motor vehicle in certain circumstances:

A governmental unit in the state is liable for:

(1)     property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

    (A)     the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle . . . ; and

    (B)     the employee would be personally liable to the claimant according to Texas law[.]

TEX. CIV. PRAC. & REM. CODE § 101.021(1). Although the TTCA waives immunity in certain limited circumstances, the TTCA also "withdraws" the waiver in several circumstances. *Powell*, 704 S.W.3d at 448–49 (quoting *Rattray*, 662 S.W.3d at 866).

The City contends that to the extent its immunity was waived under section 101.021(1), the waiver of immunity was withdrawn—thereby restoring the City's governmental immunity—because (1) Cater was entitled to official immunity; and (2) the TTCA's emergency exception applied.[3]

Official immunity is an affirmative defense that shields governmental employees from personal liability; it is not the governmental employer's defense. *Rodriguez*, 704 S.W.3d at 468; *see City of Houston v. Sauls*, 690 S.W.3d 60, 69 (Tex. 2024) ("Official immunity shields government employees from liability in civil lawsuits that, with the benefit of hindsight, would second-guess their performance of discretionary duties and force them to defend decisions that were reasonable when made."). However, as stated above, section 101.021(1) conditions the employer's

---

[3]     We discuss the emergency exception in the following section.

24

waiver of immunity in part on whether "the employee would be personally liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM. CODE § 101.021(1)(B). The Texas Supreme Court has repeatedly interpreted this subsection to mean "that the governmental employer's immunity is not waived if its employee is protected by official immunity." *Rodriguez*, 704 S.W.3d at 468 & n.22 (collecting cases).

Because official immunity is an affirmative defense, "a governmental employer bears the burden to assert and prove its employee's official immunity, in a manner analogous to an affirmative defense, to preclude enforcement of the [TTCA's] waiver of governmental immunity on that ground." *Id.* at 469; *see Nicolai*, 695 S.W.3d at 494 (stating that defendant moving for summary judgment on affirmative defense must conclusively establish each element of defense). This is true even though the plaintiff generally bears the burden of affirmatively showing that the governmental employer's immunity is waived. *Rodriguez*, 704 S.W.3d at 469 & n.26 (stating that plaintiff could meet its burden of affirmatively showing waiver of governmental immunity, including that employee would be personally liable, without affirmatively negating official immunity) (quotation omitted).

"'[P]erhaps most vital in police work,' official immunity protects officers 'when they are performing (1) discretionary duties, (2) in good faith, and (3) within the scope of their authority.'" *Id.* at 468 (quoting *Sauls*, 690 S.W.3d at 69–70).

25

Here, the only element of official immunity disputed by the parties is whether Cater performed his duties in good faith. In an emergency response case, a police officer acts in good faith when "a reasonably prudent officer, under the same or similar circumstances, *could have believed* that the *need* to immediately apprehend the suspect" or respond to an emergency "outweighed a clear *risk* of harm to the public in continuing the pursuit" or response. *Id.* at 472 (quoting *Sauls*, 690 S.W.3d at 72–73). The good-faith test is "one of objective legal reasonableness, without regard to whether the government official involved acted with subjective good faith." *Sauls*, 690 S.W.3d at 73 (quotation omitted). The standard protects "all but the plainly incompetent." *Id.* at 75 (quotation omitted).

In applying the good-faith test, we balance the need for immediate police intervention against the risk inherent in countervailing public-safety concerns. *Rodriguez*, 704 S.W.3d at 472. In assessing the need for immediate police intervention, we consider the following factors: (1) the seriousness of the crime to which the officer is responding; (2) the need for the officer's immediate presence to prevent injury or loss of life or to apprehend a suspect; and (3) the availability of any alternative courses of action to achieve a comparable result. *Id.*

In assessing the risk to public safety, we consider the following factors: (1) the nature and severity of harm that the officer's actions could cause, including injuries to bystanders as well as the possibility that the vehicle accident might prevent the

26

officer from reaching the scene of the emergency that drew the action, (2) the likelihood that harm would occur, and (3) whether any risk of harm would be clear to a reasonably prudent officer based on the officer's perception of the facts at the time. *Id.*; *Sauls*, 690 S.W.3d at 73 (quoting *Wadewitz v. Montgomery*, 951 S.W.2d 464, 467 (Tex. 1997)).

To be entitled to summary judgment, the governmental unit's summary judgment evidence "must sufficiently assess particularized need-risk factors with reference to specific facts" and show that a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to immediately respond to the emergency outweighed a clear risk of harm to the public. *Rodriguez*, 704 S.W.3d at 472. Magic words are not required to satisfy this test, and the test is not onerous. *Id.* "The focus is 'on the objective facts and information the officer knew and perceived, not on whether the officer had subjectively considered and assessed certain factors.'" *Id.* (quoting *Sauls*, 690 S.W.3d at 74–75).

If the governmental unit meets its burden to conclusively establish official immunity, the burden shifts to the nonmovant to meet an "elevated standard of proof" by showing that no reasonably prudent officer "in the defendant's position could have thought the facts were such that they justified defendant's acts." *Sauls*, 690 S.W.3d at 75–76.

27

## 2.    Analysis

The City argues that Cater acted in good faith because he was responding to a high priority emergency call involving a shooting, and his immediate presence was necessary to provide aid to the victim and attempt to apprehend the suspected shooter. The City further argues that the risk to public safety was minimal because Cater considered alternative routes and his speed to provide the safest response; the weather was clear; the roads were dry; and traffic was light. The City also contends that Cater activated his emergency lights and siren as he approached the intersection, and he slowed down and looked for oncoming traffic before driving through the red light.

Johnson responds that the City's own summary judgment evidence contained fact issues concerning Cater's speed, use of the emergency siren, and whether he slowed down and looked for oncoming traffic before running the red light at the intersection. Alternatively, Johnson argues that his summary judgment evidence raised factual disputes on whether Cater acted in good faith.

We first consider, as we must, whether the City met its summary judgment burden to conclusively establish that Cater performed his duties in good faith. *See Rodriguez*, 704 S.W.3d at 469; *Nicolai*, 695 S.W.3d at 494. To meet this burden, the City's summary judgment evidence must have conclusively shown that "a reasonably prudent officer, under the same or similar circumstances, *could have*

*believed* that the *need* to immediately apprehend the suspect" or to respond to the emergency "outweighed a clear *risk* of harm to the public in continuing the pursuit" or response. *Rodriguez*, 704 S.W.3d at 472 (quoting *Sauls*, 690 S.W.3d at 72–73). We conclude that the City did not meet this burden.

At the outset, we note several undisputed facts for context. The vehicle crash occurred at the intersection of Crosstimbers and a Highway 59 service road in northeast Houston. Cater was responding to a reported shooting, and he exited Highway 59 at Crosstimbers, turned left on Crosstimbers from the northbound service road, and drove under the highway overpass. As he approached the next intersection with the southbound Highway 59 service road, Cater had a red light. He decided to run the red light, which police officers may do "after slowing as necessary for safe operation." *See* TEX. TRANSP. CODE § 546.001(2). Immediately after running the red light, Cater's patrol vehicle struck Johnson's car in the intersection. The crash report stated that Johnson had been driving on the southbound service road toward the intersection, and Johnson had a green light at the intersection. Cater was driving in a 35 mile-per-hour zone when the crash occurred, and Cater and Johnson were the only two witnesses to the crash.

Beyond these undisputed facts, the parties dispute whether the City conclusively established Cater's speed, whether his emergency siren was activated,

29

whether he slowed down, and whether he looked for oncoming traffic before driving through the red light. We turn to the City's summary judgment evidence.

First, regarding Cater's speed, Cater stated in a HPD crash questionnaire that he was driving between 35 and 60 miles per hour when the crash occurred, and he "was driving fast and in a hurry[.]" Cater subsequently stated in his affidavit, however, that he was driving under 35 miles per hour. But in Johnson's statement, which was also included in the City's summary judgment evidence, Johnson reported that Cater was driving "about 70" miles per hour.

Second, regarding Cater's use of his emergency siren, Cater stated in the questionnaire that he was "unsure" whether his siren was activated. In his affidavit, however, he stated that he "believe[d] [he] turned on the siren" as he exited Highway 59 prior to the crash. He based this belief on a video recording from his body camera, which we discuss below. Johnson, on the other hand, told HPD Sergeant Hill, who investigated the crash, that he "didn't hear sirens or see any lights." In a separate written statement, Johnson stated that he did not see lights or hear a siren until seconds before the impact.

Third, concerning whether Cater slowed down before driving through the intersection, Cater stated in the questionnaire that he slowed down, ensured the intersection was clear, and he was "picking up speed" as he drove through the red light. Similarly, in his affidavit, he stated that he slowed down to under 35 miles per

30

hour at the red light before he "increase[d] [his] speed slightly." Johnson's statements did not indicate whether Cater slowed down or not.

Fourth, concerning whether Cater looked for oncoming traffic, Cater stated in the questionnaire that he "looked both ways" before going through the intersection, but he also stated that he first saw Johnson's car when it was "in front of" his patrol car as he drove through the red light into the intersection. Similarly, he stated in his affidavit that he looked "where traffic would be coming from but did not see a vehicle," but he also stated that he first saw Johnson's car when it was in front of him. The crash report indicates that Johnson had been driving in the direction Cater claimed he looked before driving through the intersection.

Acknowledging that this evidence contains some inconsistencies, the City argues on appeal that a video recording from Cater's body camera supported Cater's version of the events, i.e., that Cater was driving about 35 miles per hour with his emergency siren on, he slowed down to ensure the intersection was clear, and he looked for oncoming traffic before driving through the red light. The City relies on the United States Supreme Court's opinion in *Scott v. Harris* to argue that the video recording conclusively established these facts and blatantly contradicted Johnson's versions of the events. *See* 550 U.S. 372, 380–81 (2007) (stating, in summary judgment proceeding under Federal Rules of Civil Procedure, that when two parties tell different versions of police chase and one party's version is "utterly discredited"

31

by video recording such that no reasonable jury could believe it, court should adopt version shown in recording when ruling on summary judgment motion). We disagree with the City's characterization of the video recording.

The recording attached to the City's motion is approximately three minutes long. It begins a few minutes before the crash and ends shortly after the crash. The view from the camera is angled up from the front of Cater's body through the front windshield. The steering wheel blocks the speedometer. Due to the upward angle, the recording shows some street signs, stop lights, and the highway overpass, but it does not show the road or Johnson's car when Cater hit it. No siren can be heard in the recording until immediately after the crash.

We conclude that the video neither contradicts Johnson's version of events nor supports Cater's version. It is difficult if not impossible to determine Cater's speed because the steering wheel blocks the speedometer, and the view of the occasional streetlight and the highway overpass from the upward angle of the video provides little evidence showing his speed. Likewise, the upward angle provides no indication that Cater slowed down or sped up, both of which he claimed to do before running the red light. Moreover, the recording includes the sound of a siren after the crash, but not before it. Finally, the video recording does not capture Cater's face or indicate whether he looked in the direction of oncoming traffic. Therefore, we disagree with the City that the video recording conclusively establishes Cater's

version of events or discredits Johnson's version of events. *See Wilson*, 168 S.W.3d at 816 (stating that evidence is conclusive if reasonable people could not differ in conclusion).

Finally, in the crash report, HPD Sergeant Hill concluded that Cater "failed to exercise duty and care." Importantly, this conclusion was reached by HPD, Cater's employer. Although the crash report does not contain specific details about why Cater failed to exercise duty and care, the conclusion nevertheless raises a fact issue concerning Cater's version of the events and the reasonableness and necessity of taking the actions he did.

In sum, the City's summary judgment evidence boils down to competing versions of the car crash by the only two witnesses to it: Cater and Johnson. Johnson stated that Cater was driving nearly 70 miles per hour, and he did not hear sirens or see lights on Cater's patrol car at all (or until a few seconds before the crash). Cater inconsistently stated that he was driving between 35 and 60 miles per hour and under 35 miles per hour; that he was "unsure" whether his siren was activated and that it was activated; that he slowed down and sped up before running the red light; and that he looked in the direction of oncoming traffic, where Johnson's car was undisputedly located, but he first saw Johnson's car when it was directly in front of him in the intersection.

33

These factual disputes are properly resolved by a factfinder, not by a court as a matter of law in summary judgment proceedings. *See* TEX. R. CIV. P. 166a(c). Viewing the evidence in the light most favorable to Johnson without disregarding necessary contextual evidence and unfavorable evidence if reasonable jurors could not, as we must, we conclude that the City's summary judgment evidence shows that when Cater ran the red light in a 35-mile-per-hour zone, Cater was driving approximately 70 miles per hour; he did not have his siren on; he slowed down or sped up to 70 miles per hour; and he may not have looked for oncoming traffic. *See Powell*, 704 S.W.3d at 448; *Branch*, 695 S.W.3d at 586–87.

These factual disputes are significant when we consider whether the City conclusively established that the need for Cater's response to the reported shooting outweighed the clear risks to public safety in doing so the way he did. *See Rodriguez*, 704 S.W.3d at 469, 472 (quoting *Sauls*, 690 S.W.3d at 72–73) (stating that officer acts in good faith when "a reasonably prudent officer, under the same or similar circumstances, *could have believed* that the *need* to immediately apprehend the suspect outweighed a clear *risk* of harm to the public in continuing the pursuit").

In assessing the need for immediate police intervention, we consider the seriousness of the crime to which Cater was responding, the need for his immediate presence to prevent injury or loss of life or to apprehend a suspect, and any available alternative courses of action to achieve a comparable result. *Id.* at 472. The City's

34

summary judgment evidence shows that Cater had received a priority two call that a shooting had just occurred approximately five miles from his patrol location, and the shooter was still near the scene. Cater stated that a priority two call is a high priority call that "can require several officers on the scene" to provide first aid to the victim and to attempt to apprehend the suspected shooter.

However, we cannot ignore the evidence implying that Cater was not responding to the highest priority call. As Cater stated in his affidavit, a priority two call does not require a response with emergency lights and siren, unless certain circumstances are present, such as the urgency of the call, the facts that are being reported from the scene, and the need to arrive quickly. The evidence indicates that Cater was responding to a report that someone had been shot in the leg. Nevertheless, we agree with the City to the extent it argues that Cater was responding to a report of a serious crime that required his immediate presence.

Concerning the third factor—the availability of alternative courses of action to achieve a comparable result—the City argues that Cater considered the availability of alternate routes, his speed, the clear weather, the dry roads, and the light traffic. But Johnson does not allege or argue that Cater should have taken a different route or that the driving conditions were less than optimal. Rather, Johnson alleges and argues that Cater should have reduced his overall speed, used his

35

emergency siren, slowed down to ensure the intersection was clear, and looked for oncoming traffic. The City does not consider these alternative actions.

Yet all these alternative actions were available to Cater, even along the same route and under optimal driving conditions. For example, Cater could have come to a complete stop at the red light, turned on his emergency siren, and spent a few extra seconds ensuring that the intersection was clear and that no traffic was approaching the intersection. We do not mean to imply that these particular actions were necessary. But we conclude that these actions were available alternatives that would have delayed Cater's arrival to the shooting location by a brief amount of time, assuming he could not make up this time by driving faster after passing through the intersection. *See* TEX. TRANSP. CODE § 546.001(3) (authorizing emergency vehicle to exceed maximum speed limit).

The City provides no argument or evidence that the reported shooting was so serious and Cater's presence so immediately necessary that he could not have reduced his speed, sounded his siren or horn, slowed down, and looked for oncoming traffic before running the red light. *See Gomez v. City of Houston*, 587 S.W.3d 891, 899–901 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (en banc) (concluding that governmental unit did not conclusively establish its employee acted in good faith when it assumed truth of disputed facts in light favorable to it). True, Cater stated in his affidavit that his actions were reasonable. For example, he stated that it

would have been reasonable to respond without a siren because the siren could alert the suspected shooter of law enforcement's presence. He also stated that it would have been reasonable and necessary to drive at 70 miles per hour, although he provided no further explanation. But Cater did not explicitly address or implicitly discount spending a brief additional amount of time to ensure traffic was clear at the intersection before running the red light or how such alternative action would have hindered his immediate response to the location of the reported shooting. *See Sauls*, 690 S.W.3d at 75 (stating that, in assessing good-faith factors, alternative courses of action may be implicitly discounted instead of explicitly addressed) (quotation omitted). To the extent his affidavit does implicitly discount such an available alternative course of action, his statements are undermined by his own employer's conclusion in the crash report that he "failed to exercise duty and care."

We are mindful that the availability of alternatives "is just one factor" and "does not alone determine good faith." *Id.* (quotation omitted). In this case, however, the availability of alternative courses of action to achieve a comparable result is the primary dispute between the parties and the focus of significant factual disputes. The lack of evidence showing that any available alternative course of action would have materially hindered Cater's response to the reported shooting reduces the overall significance of the need for an immediate police response.

These available alternative courses of action and the factual disputes discussed above also play a significant role in assessing the clear risk to public safety caused by Cater's actions. *See Rodriguez*, 704 S.W.3d at 472 (listing risk factors). The City argues that Cater's patrol car was in good working condition, and he considered the driving conditions and the route he should take to ensure a safe approach to the shooting location. The City does not, however, consider other risk factors present when we view the disputed facts in the light most favorable to Johnson: that Cater was driving nearly 70 miles per hour in a 35 mile-per-hour zone without his siren, without slowing, and without looking for oncoming traffic before running a red light at an intersection in an urban environment. *Cf. Martinez v. Harris Cnty.*, 526 S.W.3d 557, 563 (Tex. App.—Houston [1st Dist.] 2017, no pet.) ("Good faith does not require consideration of risks that did not exist in a particular case. An assessment of road, weather, and traffic conditions may suffice if the record does not indicate that other circumstances affected the risk.") (citations omitted).

To assess risk, we first consider the nature and severity of harm that the officer's actions could cause, including injuries to bystanders and the possibility that an accident could prevent Cater from responding to the reported shooting. *See Rodriguez*, 704 S.W.3d at 472. It is self-evident that any person driving at 70 miles per hour in a 35-mile-per-hour zone can cause significant bodily injury and property damage if the person hits another vehicle or a pedestrian. Indeed, the Texas Supreme

Court has repeatedly acknowledged the "inherent risks that high-speed driving poses to those utilizing the public streets and highways." *Id.* at 474 (quotation omitted). Furthermore, we may also consider that a car crash could have delayed or prevented Cater's response to the shooting location which prompted his emergency action in the first place. *See Sauls*, 690 S.W.3d at 73 (quotation omitted); *Gomez*, 587 S.W.3d at 898. Indeed, the evidence shows that Cater remained at the scene of the crash for at least thirty minutes. Thus, the nature and severity of harm that Cater's actions could cause is significant, even in optimal driving conditions.

We also consider the likelihood that harm would occur. *See Rodriguez*, 704 S.W.3d at 472. Assuming that when he ran the red light, Cater was driving nearly twice the speed limit without his siren on, without slowing down, and without looking for oncoming traffic, the likelihood of causing a car collision is high. Driving nearly 70 miles per hour reduced Cater's opportunity to ensure that the intersection was clear and that other drivers—who had a green light—were not lawfully approaching and entering the intersection. Indeed, although Cater claimed he slowed down (or sped up) and looked both ways before driving through the red light, he also stated that he first saw Johnson's car when it was in front of him. Moreover, the failure to use his siren deprived other motorists like Johnson of advance warning that an emergency vehicle was in the area. Had Cater utilized available alternative courses of action discussed above—reducing his overall speed,

activating his siren, slowing down further at the red light, and looking for oncoming traffic—he could have reduced the likelihood of causing serious harm in the event of an accident.

Finally, the risk of harm would be clear to a reasonably prudent officer based on Cater's perception of the facts at the time of the crash. *See id.* Importantly here, Cater's own employer concluded in the crash report that Cater "failed to exercise duty and care," which implies that a reasonably prudent officer would have exercised the duty and care that Cater failed to exercise. As stated above, there are "inherent risks that high-speed driving poses to those utilizing public streets and highways." *See id.* at 474 (quotation omitted). Thus, a reasonably prudent officer would have perceived a clear risk of serious harm to other motorists by driving as Cater did under the disputed facts present in this appeal.

We conclude that reasonable people viewing the City's summary judgment evidence could differ in their conclusion about whether a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to immediately respond to the emergency call outweighed a clear risk of harm to the public in continuing the response, particularly given the significant factual disputes present at this stage of the proceeding. *See id.* at 472 (quoting *Sauls*, 690 S.W.3d at 72–73); *Nicolai*, 695 S.W.3d at 494. Accordingly, we conclude that the City did not conclusively establish that Cater acted in good faith as required to establish his

official immunity, and thus the burden did not shift to Johnson to present evidence raising a genuine issue of material fact on this issue. *See Rodriguez*, 704 S.W.3d at 469; *Nicolai*, 695 S.W.3d at 494. We therefore hold that the trial court did not err by denying summary judgment based on the City's assertion that it was immune from suit because Cater was entitled to official immunity.

We overrule the City's first issue.

## D. Emergency Exception

In its second issue, the City contends that the trial court erred by denying summary judgment because the City retained its governmental immunity under the TTCA's emergency exception.

### 1. Governing Law

TTCA section 101.055(2) provides that even if the TTCA otherwise waives governmental immunity, the immunity waiver "does not apply to a claim arising . . . from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others[.]" TEX. CIV. PRAC. & REM. CODE § 101.055(2).

The Texas Supreme Court recently stated that the emergency exception "contemplates two distinct inquiries to be undertaken in a particular order." *Powell*,

704 S.W.3d at 449. A court must first determine whether any laws or ordinances apply to the emergency action at issue in the case. *Id.* If a law or ordinance applies wholly or partly to the emergency action at issue, then "the jurisdictional inquiry turns on whether the officer's action complied with the relevant law or ordinance." *Id.* The court considers only laws applicable to emergency action. *Id.* at 451 ("[G]enerally applicable rules of the road that do not specifically address or reference emergencies are not applicable to emergency action for purposes of the emergency exception."). If no law or ordinance applies to any part of the emergency action, then the court considers whether the officer acted with conscious indifference or reckless disregard for the safety of others. *Id.* at 450.

The emergency exception "requires a causal nexus between the plaintiff's claim and the government employee's reckless or illegal action." *See Maspero*, 640 S.W.3d at 531 (citing TEX. CIV. PRAC. & REM. CODE § 101.055(2)). Proximate causation has two elements: cause in fact and foreseeability. *Rattray*, 662 S.W.3d at 874 (quotation omitted). Cause in fact means that the act or omission was a substantial factor in bringing about the injury, and without it, the harm would not have occurred. *Id.* (quotation omitted). Foreseeability requires that the actor reasonably anticipated the dangers that his negligent conduct created for others. *Id.* (quotation omitted).

## 2. Analysis

At the outset, we note that Johnson does not dispute that Cater was responding to an emergency call at the time of the crash, which satisfies part of the emergency exception. *See* TEX. CIV. PRAC. & REM. CODE § 101.055(2). We further note that whether Cater complied with laws applicable to emergency action is dispositive of this issue.[4] *See id.*; *Powell*, 704 S.W.3d at 449 (stating that if law applies wholly or partly to emergency action at issue, jurisdictional inquiry turns on whether officer's action complied with relevant law).

The City contends that Cater complied with the relevant laws. Concerning Transportation Code section 546.001, the City argues that "Cater's conduct falls into

---

[4] The City argues that the two prongs of the emergency exception—whether the officer's actions complied with laws and ordinances applicable to emergency action and, in the absence of such laws or ordinances, whether the officer acted with conscious indifference or reckless disregard for the safety of others—"largely collapses" in this case because Johnson alleged that Cater violated Transportation Code section 546.005, which "does not relieve" an emergency-vehicle operator from "the consequences of reckless disregard for the safety of others." *See* TEX. TRANSP. CODE § 546.005(2). However, the Texas Supreme Court recently stated that the applicability of the emergency exception will not always collapse into one inquiry regarding the governmental employee's recklessness; although "[s]uch a result may often occur, as in *Maspero*," it "will depend on the content of an applicable statute or ordinance." *City of Austin v. Powell*, 704 S.W.3d 437, 449 (Tex. 2024) ("The plain language of the emergency exception, however, contemplates two distinct inquiries[,]" and the "second inquiry [concerning the officer's recklessness] is triggered only if no law or ordinance governs the emergency action at issue or any part of it."). Here, Johnson alleged that Cater violated several laws applicable to emergency action, including Transportation Code sections 546.001(2) and 546.005. Thus, we disagree that in this case the emergency exception collapses into whether Cater acted recklessly when we consider whether he violated section 546.001(2).

one subsection of § 546.001, and that is he exceeded the maximum speed limit but did not endanger life or property" under subsection (3). *See* TEX. TRANSP. CODE § 546.001(3). According to the City, Cater complied with this provision because the weather was clear, the roads were dry, there was little traffic on the road, his patrol car was in good working order, he was responding to a reported shooting which required his immediate presence, and he had activated his emergency lights or siren or both. *See id.* § 546.003 (requiring operator of emergency vehicle engaging in conduct permitted by section 546.001 to use, at operator's discretion, audible or visual signals); *but see id.* § 546.004(c)(1)(A)(iii) (authorizing police officer to operate emergency vehicle without audible or visual signals if such signals would hinder officer's ability to enforce law, such as by allowing suspect to evade apprehension).

The City does not address whether Cater violated section 546.001(2), which authorizes an emergency vehicle operator to "proceed past" a red light "after slowing as necessary for safe operation." *See id.* § 546.001(2). One of Johnson's central theories of liability against the City is that Cater violated this section.

In both his original petition and his live petition, Johnson alleged that Cater violated numerous laws and ordinances applicable to emergency action. Primarily, Johnson alleged that "the negligent acts and omissions of Officer Cater were not in compliance with [] Texas Transportation Code[] § 546.001(2)" because "Cater did

44

not proceed past the red light after slowing as necessary for safe operation." Despite this allegation, the City did not address Cater's compliance with section 546.001(2) in its summary judgment motion. In his amended summary judgment response, Johnson argued that Cater violated this section because "Cater, before running the red light, did not slow as necessary for safe[] operation." The City did not file a summary judgment reply or otherwise respond to this argument.

On appeal, the City acknowledges the existence of section 546.001(2), stating that "[w]ith respect to running a red light, the code notes that the operator may do so 'after slowing as necessary for safe operation.'" But the City then argues that Cater's conduct fell "into one subsection of § 546.001, and that is he exceeded the maximum speed limit but did not endanger life or property" under section 546.001(3). As in his summary judgment response, Johnson argues on appeal that Cater violated section 546.001(2) because "he failed to slow down as necessary before proceeding through the red light as evidenced by his Body Worn Camera and [as] corroborated by the testimonies of Hill, [Johnson], and Chief Busken." The City filed a reply brief, but it did not address whether Cater violated section 546.001(2).

We disagree with the City that subsection (3) is the only part of section 546.001 relevant to this appeal. The Texas Supreme Court has stated that Transportation Code chapter 546 generally and section 546.001(2) specifically apply to emergency action for purposes of applying the TTCA's emergency exception. *See*

45

*Powell*, 704 S.W.3d at 452, 453. We likewise conclude that section 546.001(2) applies to the specific emergency action at issue here: whether Cater slowed as necessary for safe operation before driving through the red light at the intersection where the crash occurred. Without the benefit of the City's briefing on the issue, we consider whether a fact issue exists concerning Cater's compliance with section 546.001(2).

Section 546.001(2) provides, "In operating an authorized emergency vehicle the operator may . . . proceed past a red or stop signal or stop sign, after slowing as necessary for safe operation[.]" TEX. TRANSP. CODE § 546.001(2).

As discussed above, it is undisputed that Cater was driving in a 35 mile-per-hour zone when the crash occurred; he was responding to a priority two call, which gave him discretion to respond with emergency lights and siren activated; he ran a red light; and his patrol car collided with Johnson's car. In analyzing Cater's official immunity, we considered only the City's summary judgment evidence to determine whether the City established its entitlement to summary judgment. We concluded that the City's evidence contained factual disputes concerning Cater's speed; the use of his emergency siren; whether he slowed down or sped up before running the red light; and whether he looked in the direction of oncoming traffic.

The factual disputes present in the City's evidence alone raise fact questions about whether Cater slowed as necessary for safe operation before running the red

46

light and crashing into Johnson's car. *See id.*; TEX. R. CIV. P. 166a(c) (stating that summary judgment movant has burden to establish that no genuine issue of material fact exists and movant is entitled to judgment as matter of law). In particular, the crash report reflects that HPD—Cater's own employer—concluded that Cater "failed to exercise duty and care," which reasonably implies that he did not slow as necessary for safe operation before he ran the red light.

Nevertheless, Johnson's amended summary judgment response attached several additional exhibits, including transcripts of three witnesses' deposition testimony, an expert witness declaration, Johnson's affidavit, and a longer version of the video recording from Cater's body camera. Because Johnson has the burden to affirmatively establish a waiver of immunity, including that the emergency exception did not apply, *see Powell*, 704 S.W.3d at 447, we turn to Johnson's summary judgment evidence.

In his affidavit, Johnson stated that Cater "was traveling approximately 70 miles per hour as he entered into the intersection, and [he] did not appear to slow down before impact." He also stated that he "did not hear a siren before the impact." He acknowledged his prior statement that he did not hear a siren until seconds before the impact, but he explained that this discrepancy was due to sustaining "serious injuries in the accident that necessitated surgery," he gave the statement in the

47

hospital, and upon "further reflection," he believed that he only heard the siren after the crash.[5]

HPD Sergeant Hill, who investigated the crash and authored the crash report, testified that Cater violated section 546.001(2) because "it didn't appear that he slowed down before proceeding—before approaching that intersection" or that he ran the red light safely. Hill repeatedly testified that based on his observation from the video recording of Cater's body camera, it did not appear that Cater slowed down before running the red light. He acknowledged that a police officer responding to an emergency can run a red light, but the officer must slow down to ensure that the intersection is clear. Hill further testified that in the longer version of the video recording from Cater's body camera, Cater told another officer that he did not have his siren on before the crash. Hill agreed that Cater did not run the red light safely and that if he had done so while driving 70 miles per hour—which was twice the

---

[5] The City argues that Johnson's affidavit is not credible because it was signed two-and-a-half years after the accident. We disagree. Johnson's affidavit is mostly consistent with his earlier statements. The only potential inconsistency is whether he saw the emergency lights and heard the siren on Cater's patrol car at all or seconds before the collision. However, he provided reasons for the discrepancy. We also have already determined that a fact issue exists based on Cater's own statement that he was "unsure" whether his siren was activated. We note that in the longer version of the video recording from Cater's body camera, Cater told another officer that his siren was not on before the crash. We also note that Cater signed his affidavit nearly two years after the accident and only two months before Johnson signed his affidavit. The City heavily relies on Cater's affidavit to support its arguments, but it provides no explanation why Cater's affidavit is credible, but Johnson's affidavit is not. Finally, the City did not object to Johnson's affidavit in the trial court. Therefore, we will consider Johnson's affidavit.

speed limit—then he was "reckless." Hill stated that his conclusion in the crash report that Cater "failed to exercise duty and care" was based on his determination that Cater did not slow down at the red light.

Cater testified that HPD disciplined him for failing to exercise duty and care by suspending him for two days. Cater claimed that he did not know the specific reason for the discipline, he disagreed with the disciplinary action, and he repeatedly testified that he slowed down before running the red light. However, when shown the video recording, he could not identify any specific part showing his patrol car slowing down. Instead, he testified that he slowed "continuous[ly]" beginning from the time he turned left onto Crosstimbers until he reached the red light at the next intersection with the Highway 59 service road where the crash occurred. He testified that he looked in the direction of oncoming traffic, but he also testified that he did not see Johnson's car until it was in front of him immediately before the crash.

Cater also testified that he had his siren on, although he acknowledged that a siren could not be heard in the video recording from his body camera until after the crash. He acknowledged that he told another officer after the crash that the siren had not been activated. Cater further testified that while a priority two call generally does not require use of lights or siren, an officer has discretion to use lights and siren after notifying dispatch. But he acknowledged that no evidence showed that he had requested permission to use his lights or siren.

49

Finally, Johnson attached a declaration and deposition testimony from his expert witness, former police chief Busken. Busken agreed with Sergeant Hill's testimony that Cater did not slow as necessary for safe operation, therefore violating section 546.001(2). He provided the following reason for this conclusion:

> Because [Cater was] going against the red light. The other vehicles have a green light. The green light allows them to proceed and you have to slow as necessary because you are going against the people that have the green light and officers are generally trained that they have to control that intersection before they proceed past that red stop signal or stop sign. It's not just an automatic thing that you proceed through.

Busken analogized Cater's "not slowing down, not taking control of an intersection when you are going against a red light" to "basically playing Russian Roulette behind the wheel of a vehicle." Busken stated that "there is no apparent reason Officer Cater should not have taken evasive action sooner unless he was not paying proper attention," even considering his response to the priority two call. Busken concluded that "[i]t did not appear that [Cater] slowed down to make sure that it was safe for him to proceed before entering that intersection." He stated that "Cater could have slowed down before entering the intersection and turned on both his lights and sirens to alert other motorists of his presence. This slight delay would certainly not outweigh the potential risk of causing significant bodily injuries to other motorists."

Busken also testified that even if Cater had slowed to 35 miles per hour, he still would not have been able to ensure that the intersection was clear before running

50

the red light because this speed "is still a high speed to go through an intersection when there [are] . . . other motorists present that have a green light." Busken opined that Cater could have prevented the accident if he had taken a brief amount of additional time as necessary to slow down and make sure it was safe to enter the intersection or to warn other drivers of his presence by activating his emergency siren or even honking his horn. Finally, Busken testified that the crash report's conclusion that Cater failed to exercise duty and care was based on Cater's failure to "slow down . . . enough to . . . make sure that it was safe before he entered the intersection." Busken opined that this failure to exercise duty and care was the only factor contributing to the accident.

Viewing the summary judgment evidence in the light most favorable to Johnson, as we must, we conclude that Johnson has established genuine issues of material fact concerning whether Cater violated Transportation Code section 546.001(2) by driving through the red light at the intersection where the crash occurred without slowing as necessary for safe operation. *See* TEX. TRANSP. CODE § 546.001(2); TEX. R. CIV. P. 166a(c). Johnson and Cater present opposing versions of Cater's compliance with this law. Two other witnesses—including HPD Sergeant Hill—expressly testified that Cater violated this law, and Cater testified that HPD disciplined him for his actions related to the car crash. Thus, fact issues exist concerning whether Cater complied with section 546.001(2).

The City also argues that Johnson's evidence does not establish a causal connection between Cater's actions and Johnson's alleged harm. According to the City, "it is inconsequential whether the siren was on at the time of the crash because any suggestion that the siren would have prevented the crash is speculation at best." We disagree.

The City relies on *Maspero*, in which the Texas Supreme Court concluded that the plaintiffs did not explain how their injuries arose from an officer's failure to use her siren. *See* 640 S.W.3d at 531. Unlike here, however, the officer in *Maspero* was pursuing a drug trafficker in her patrol car when the trafficker drove against traffic on a service road and collided head-on with the plaintiffs' vehicle. *See id.* at 525–27. The parties' evidence conflicted about whether the officer had her siren on at the time. *Id.* at 527. The court concluded that "[a]ny suggestion that the siren would have prevented the collision, particularly given the extreme recklessness of [the fleeing drug trafficker's] conduct, is speculation at best." *Id.* at 531.

As Johnson points out, by contrast, Cater was not pursuing a fleeing suspect's vehicle, and the undisputed summary judgment evidence establishes that Cater's patrol car hit Johnson's car. In this case, a siren would have alerted motorists like Johnson to the presence of a nearby emergency vehicle and provided an opportunity for other motorists to yield to Cater's patrol car. Texas law requires that when an emergency vehicle approaches with audible and visual signals, other motorists must

yield the right-of-way and stop until the emergency vehicle has passed. TEX. TRANSP. CODE § 545.156(a)(1), (a-1). Moreover, section 545.156 "does not exempt the operator of [an emergency vehicle] from the duty to drive with due regard for the safety of all persons using the highway." *Id.* § 545.156(b). If Cater had used his siren and if Johnson had seen Cater's emergency lights and heard the siren, he would have been required to yield the right-of-way to Cater. Thus, unlike in *Maspero*, fact issues exist concerning whether Cater's failure to use his siren was a substantial factor in causing the injury, whether Johnson would have been harmed if Cater had activated the siren, and whether Cater reasonably anticipated the danger that driving at 70 miles per hour through a red light without a siren created for other motorists. *See Rattray*, 662 S.W.3d at 874 (discussing proximate causation).

Even more importantly, however, Cater's failure to activate his siren was not the only alleged proximate cause of the accident. As discussed above, the more relevant cause of the accident for purposes of the applicability of the emergency exception was whether Cater slowed as necessary for safe operation before running the red light. The factual disputes concerning Cater's overall speed, whether he activated the siren, whether he slowed down, and whether he looked for oncoming traffic also raised fact issues about whether Cater's actions proximately caused Johnson's injury. *See id.* The conclusion in the crash report that Cater failed to exercise duty and care, as well as HPD's disciplinary measures against Cater related

53

to the car crash, also raise fact questions about whether Cater's actions were the proximate cause of Johnson's alleged harm. Thus, we conclude that Johnson has raised a genuine issue of material fact concerning whether Cater's emergency response proximately caused Johnson's injury.

We conclude that fact issues exist concerning whether Cater complied with Transportation Code section 546.001(2) by slowing as necessary for safe operation before running the red light and colliding with Johnson's vehicle, and whether Cater's actions proximately caused Johnson harm.[6] Accordingly, we hold that the trial court did not err by denying the City's motion for summary judgment on the ground that the City retained its immunity under the TTCA's emergency exception.

We overrule the City's second issue.

## Conclusion

This case is inappropriate for summary judgment. The only two witnesses—Johnson and Officer Cater—offer different versions of the crash sequence, and each of their versions presents contradictions, inconsistencies, and credibility questions that must be resolved by a jury. Although the City is entitled to raise its governmental immunity from suit and to appeal an adverse determination, *see* TEX. CIV. PRAC. &

---

[6] Because we conclude that fact issues exist concerning Cater's compliance with a law applicable to emergency action, we need not separately consider whether Cater acted with conscious indifference or reckless disregard for the safety of others. *See* TEX. CIV. PRAC. & REM. CODE § 101.055(2); *Powell*, 704 S.W.3d at 449; TEX. R. APP. P. 47.1.

54

REM. CODE § 51.014(a)(8), the City, as the summary judgment movant, must still meet its burden to establish its entitlement to immunity. *See* TEX. R. CIV. P. 166a(c); *Powell*, 704 S.W.3d at 448. It did not do so here.

The events of April 6, 2020, are now more than five years behind us and receding with each day that goes by. "Delay haunts the administration of justice," and "[t]he passage of that much time presents substantial impediments to the full and fair determination of the facts in this case—or in any case." *S. Pac. Transp. Co. v. Stoot*, 530 S.W.2d 930, 931 (Tex. 1975). "The most erratic gear in the justice machinery is at the place of fact finding, and possibilities for error multiply rapidly as time elapses between the original fact and its judicial determination. If the facts are not fully and accurately determined, then the wisest judge cannot distinguish between merit and demerit. If we do not get the facts right, there is little chance for the judgment to be right." *Id.*

We affirm the trial court's order denying the City's motion for summary judgment.


David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

55